## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

| | |
|---|---|
| REGINA ALONSO, | |
|     Plaintiff, | |
|     v. | CASE NO.: |
| GOOGLE LLC, YOUTUBE LLC, JAMES JACKSON, also known online as "ONISION," and LUCAS JACKSON, formerly known online as "LAINEYBOT," "LAINEY" and "KAI," | **JURY TRIAL DEMANDED** |
|     Defendants. | |

## <u>COMPLAINT</u>

This is a civil action for damages against YouTube and its parent company, Google, James Jackson known online as "Onision," and Lucas Jackson, formerly known online as "Laineybot," "Lainey," and "Kai," under the federal statutes 18 U.S.C. § 1595, Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 2255, Civil Remedies for Personal Injuries, and related state law claims arising from Defendant's conduct when it granted an agency and/or profit-sharing relationship to a predator, Onision, that used YouTube to identify, recruit, solicit, and groom, children, and coordinated with his spouse, Lainey, to lure, entice, and solicit children for the ultimate goal of engaging in sexual activity with them. Plaintiff was one of these victims. Plaintiff respectfully submits her complaint for damages and makes the following averments:

**INTRODUCTION**

1.      This lawsuit will reveal how Google's YouTube Partnership Program through the YouTube platform enabled, facilitated, and profit-shared in the identification and grooming of vulnerable children by two adult predators known as Onision and Lainey.

2.      Defendant James Jackson, a/k/a "Onision," is a predator who, when faced with the allegations raised against him, began a series of attacks against the victims online in an effort to intimidate and threaten his victims into silence.

3.      Defendant Lucas Jackson, a/k/a "Laineybot," "Lainey" or "Kai," is married to James Jackson, a/k/a "Onision," and used new fame as Onision's spouse to lure and entice underage children to engage in sexual acts and exchange Child Sexual Abuse Material ("CSAM")[1] images with her online.

4.      All predators must identify vulnerable individuals that could become their potential victims.  Once a victim, or a pool of victims is identified, the predator must find a way to recruit, lure, entice, and corral those victims into their web so that the predator might snare them for his illicit purpose.

5.      Part of ensnaring a victim is a process called grooming.

6.      "Grooming" is a deceptive process, enacted by a would-be abuser, in

---

[1] While federal statutes still use the phrase "child pornography," that phrase does not adequately reflect the true nature of exploitation and the images of children reflected in them. As such CSAM more accurately reflects these materials and this complaint shall use the phrase CSAM.

which the perpetrator selects a victim, gains access to and isolates the victim, develops

trust and/or dependency in the victim's mind, and desensitizes the victim to sexual

content and physical contact.[2]

7.     A sophisticated predator is skilled at creating confusion, deception, and

doubt, but simultaneously gaining trust, acceptance and affection or love from the

victim. A predator will charm others and convince the responsible adults around their

victim (or intended victim) that nothing is amiss or should be concerning.[3]

8.     James Jackson, also known by his internet persona, "Onision,"

("Onision") created a channel on Google's YouTube platform in 2006 and began

posting to it in October of 2007.

9.     YouTube is an online global video sharing and social media platform.

10.     YouTube is the second most visited website, only second to Google

search.

11.     YouTube has more than 2.5 billion users monthly, making YouTube one

of the largest social media companies in the world.[4]

12.     YouTube has an unprecedented social impact and has influenced popular

---

[2] Elizabeth Jeglic, Ph.D. and Cynthia Calkins, Ph.D., *Protecting Your Child from Sexual Abuse: What You Need to Know to Keep Your Kids Safe* (Feb. 13, 2018).

[3] Malcolm Gladwell, *In Plain View, How Child Molesters Get Away with It*, The New Yorker (Sept. 17, 2012), available at https://www.newyorker.com/magazine/2012/09/24/in-plain-view.

[4] Dixon, S., *Most popular social networks worldwide as of January 2022, ranked by number of monthly active users*, Statista (July 26, 2022), available at https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/.

culture, internet trends, and has allowed the rapid spread of video media worldwide at the click of a button.

13.     Certain YouTuber's rose in popularity quickly and gained celebrity status amongst their viewers.

14.     Onision quickly became known quickly for his following and began creating and posting videos to YouTube. He rapidly became widely known for his commentary, some of which was objectifying, offensive, and controversial.

15.     At his peak, Onision had over 2 million subscribers.

16.     Onision targeted underage girls online and provided material that appealed to that age group, such as comments on body image, appearance, self-identity, suicide ideology, and similar topics. Onision would also rate and comment on pictures of people and their bodies, often sent to him by young teen girls.

17.     Specifically, Onision appealed to minor females, like Plaintiff, who were young, vulnerable, questioning their self-image or identity, or were seeking answers and guidance.

18.     YouTube's product and non-neutral algorithm specifically targeted minors with these interests and suggested Onision's harmful and controversial content to minor teen users.

19.     In 2009, Onision gained huge popularity online after his release of the "Banana Song," which went viral with over 90 million views, and was featured on national television in 2010.

20.     At the same time, Onision's popularity was attributable to his

4

commentary and skits portraying other YouTubers.

21.     Onision became a famous and popular YouTuber on the platform and became monetized.

22.     When a person becomes monetized, YouTube and that person sign a YouTube Partner Program (YPP) contract, which forms an agency and/or profit-sharing relationship.

23.     Joining the YPP is optional, but if someone becomes a YouTube Partner, Google handles all the advertising placement, revenue collection, and pays the YouTube partner their portion of the profits, pursuant to the contract signed.[5]

24.     As a member of the program, Google "matches [the YouTube Partner's] videos with advertisers, decides what ads will appear, and keeps track of all traffic (views), as well as ad responses. YouTube then pays [the YouTube Partner] accordingly for [their] participation in the Partner program."[6]

25.     YouTube Partners agree to follow and abide by the YouTube Terms of Service and Community Guidelines.

26.     A YouTube Partner that fails to comply with the YouTube Terms of Service and Community Guidelines can be demonetized or have their video removed, among other penalties.

---

[5] Rich, Jason, *How to Become A YouTube Partner*, Entrepreneur (Dec. 19, 2013), available at https://www.entrepreneur.com/science-technology/how-to-become-a-youtube-partner/229919.

[6] *Id.*

5

27.     Onision ran several YouTube channels, to include but not limited to Onision, OnisionSpeaks, UhOhBro, OnisionEncore, OnisionArchive, Laineybot, and CoolGuyKai.

28.     Upon information and belief, all of these channels were monetized under the YPP.

29.     Onision used his fame and platform to objectify children, to form relationships with underage girls, to entice them, groom them, and to arrange transportation across state lines and facilitate further grooming and sexual activity.

30.     Onision began pursuing 17-year-old Taylor Anderson ("Lainey" or "Kai"), who went by the internet persona of "Laineybot." Taylor legally changed her name several times and currently goes by the legal name, Lucas Jackson.

31.     In November of 2012, Lainey and Onision got married.

32.     After Onision introduced Lainey to his followers, Lainey instantly became a part of the Onision channel and gained fame through her marriage.

33.     Lainey began flirting with and grooming underage girls that were fans of Onision through the YouTube platform, including but not limited to the Onision channels and forums.

34.     Those same girls were then invited to Lainey and Onision's home with the intent to engage in sexual acts and three-way sexual encounters with the couple, or for additional grooming to achieve the ultimate goal of sexual conquest by Lainey and/or Onision.

35.     YouTube was put on notice many times that Onision was violating the

6

YouTube Terms of Service and Community Guidelines, but YouTube took no action to deter or demonetize Onision based on the numerous complaints or violative content he posted.

36.     YouTube was receiving value and profit-sharing with Onision on violent and harmful content, as well as content used to lure, entice, and recruit underage girls.

37.     YouTube continued to allow their partner, Onision, to post his content, which in turn recruited, lured and enticed Regina to reach out to Lainey through the Onision forums.

38.     Regina came to know who Lainey was by watching the Onision channels and saw her as a celebrity because she was married to Onision.

39.     Lainey later befriended Regina online.

40.     After flirting with and grooming Regina from age 14 through 17 years old, Lainey invited Regina to visit her and Onision at their home in Washington State.

41.     Regina attempted to go, but her mother refused to allow her to travel.

42.     After notifying Lainey that she was not able to go, Lainey quickly began replacing her with the next victim – a girl named Sarah.

43.     Lainey used Regina, unbeknownst to her, to gain trust with Sarah as well.

## **PARTIES**

### A. Plaintiff.

44.     Regina is a resident of Florida.  Regina is *sui juris*.

45.     At all relevant times, Regina was a minor.

**B. Defendants.**

46.     Defendant James Jackson, also known by his online persona "Onision," is a United States citizen and a resident of the State of Washington.

47.     Defendant Lucas Jackson, formerly known by her online personas as "Laineybot," "Lainey," and "Kai," is a United States citizen and a resident of the State of Washington.

48.     Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountainview, California.

49.     Defendant YouTube LLC is a Delaware limited liability corporation with its principal place of business in Mountainview, California.

50.     Since 2006, Google has operated YouTube.

51.     Defendants Google and YouTube are referred to jointly as "YouTube."

52.     At all relevant times, YouTube designed, maintained, manufactured, marketed, advertised, promoted, owned, operated and distributed the social media platform YouTube.

## <u>JURISDICTION AND VENUE</u>

53.     This Court has federal question subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiffs bring this action under 18 U.S.C. §§ 2255 and 1595.

54.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties have complete diversity, insofar as

Plaintiff is a Florida resident, Defendants Onision and Lainey are Washington residents, and Defendant YouTube has its principal place of business in California.

55.     This Court has personal jurisdiction over the Defendants because they have committed the acts complained of herein in this State and in this District.

56.     Defendants have significant contacts with the Middle District of Florida such that they are subject to the personal jurisdiction of the Court.

57.     This Court has personal jurisdiction over the YouTube Defendants for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, inter alia, regularly conducting and soliciting business in this State and this District, deriving substantial revenue from products and/or services provided to persons in this State and this District, and in some circumstance, from products and services provided from persons in this State.

58.     Defendants have significant contacts in each of the States and Territories of the United States, such that personal jurisdiction would be proper in any of them.

59.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the Middle District of Florida. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said District.

60.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the other claims are related to the claims with original jurisdiction and form part of the same case or controversy.

61.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claims asserted in this action, occurred in the

judicial district where this action is brought, as Plaintiff engaged on the computer in this District.

**FACTUAL ALLEGATIONS**

**SECTION 230 OF THE COMMUNICATIONS DECENCY ACT**

62.    Nearly three decades ago, Congress passed the Communications Decency Act of 1996 ("CDA of 1996") which included Section 230 ("CDA 230").[7]

63.    Congress intended that CDA of 1996 would accomplish several things, to include: (1) to promote the free exchange of information and ideas over the internet and (2) to encourage voluntary monitoring for offensive or obscene material.[8]

64.    Since its passage, the Internet has grown and is now no longer a fragile new means of communication, but rather is the predominant medium of communication and commerce nationwide, if not in the world.

65.    In 2018, Congress passed a bill known as Fight Online Sex Trafficking Act ("FOSTA") in which Congress clarified that CDA 230 was never intended to offer an immunity or liability shield for criminal conduct, such as sex trafficking, prostitution, or the exploitation of children that occurred on or through online platforms.

**GOOGLE'S YOUTUBE PLATFORM, BUSINESS MODEL,
AND CONTENT MODERATION POLICIES AND PRACTICES**

66.    YouTube is an online global video sharing and social media platform and

---

[7] 47 U.S.C. § 230.

[8] 47 U.S.C. § 230(b).

10

was the second most visited website in the world in 2022, only second to Google search.

67.    YouTube has more than 2.5 billion users monthly, making YouTube one of the largest social media companies in the world.[9]

68.    You Tube has an unprecedented social impact and has influenced popular culture, internet trends, and has allowed the rapid spread of video media worldwide at the click of a button.

69.    In 2010, the concept of the "YouTuber" became a national phenomenon in which the possibility of achieving celebrity status went from being for a few to being possible for anyone that had access to the Internet.

70.    Much of the activity on YouTube has been monetized, and YouTube and Google use most of the data and information YouTube has learned about its users and videos to raise revenue and drive profits.[10]

71.    Google monetizes its YouTube platform through both advertising revenue, as well as non-advertising.  Advertising revenue is derived from YouTube ads

---

[9]Dixon, S., *Most popular social networks worldwide as of January 2022, ranked by number of monthly active users*, Statista (July 26, 2022), available at https://www.statista.com/statistics/272014 /global-social-networks-ranked-by-number-of-users/.

[10] Bergen, Mark, *Like, Comment, Subscribe: Inside YouTube's Chaotic Rise to World Domination* (2022); Nilay Patel, *Everyone knows what YouTube is—few know how it really works*, The Verge (Sept. 13, 2022), available at https://www.theverge.com/2022/9/13/23349037/mark-bergen-youtube-creators-tiktok-algorithm; Kevin Lozano, *How YouTube Created The Attention Economy,* The New Yorker (Oct. 4, 2022), available at https://www.newyorker.com/books/under-review/the-overlookedtitan-of-social-media.

and revenue generated on YouTube properties.  Non-advertising revenue is derived through the sale of YouTube Premium and YouTube TV subscription services.[11]

72.     YouTube, which saw approximately $20 billion in profits in 2020 and approximately $28 billion in 2021, accumulates a massive amount of revenue from its advertising.[12]

73.     Between March 2020 and February 2021, YouTube's top 10 advertisers spent over $1 billion.[13]

74.     In order to increase advertising revenue, YouTube has created a platform which allowed any person that wants to create content on YouTube to have the ability to achieve fame, popularity, and monetization if they meet the eligibility criteria to join the YouTube Partnership Program ("YPP").

75.     The eligibility requirements of the YPP require that the applicant obtain 1000 subscribers with 4000 valid public watch hours in a 12-month period of time. Once eligibility is achieved, YouTube will review the channel to determine if it conforms with the Community Guidelines, and then allow the user to become

---

[11] Alphabet Inc. Form 10-K for Fiscal Year Ended December 31, 2021. Securities and Exchange Commission, 2021, https://abc.xyz/investor/static/pdf/20220202_alphabet_10K.pdf.

[12] Graham, Megan, et al., *How Google's $150 billion advertising business works*, CNBC (Oct. 13, 2021), available at https://www.cnbc.com/2021/05/18/how-does-google-make-moneyadvertising-business-breakdown-.html; Id.

[13] Statista, *Leading YouTube advertisers in the United States between March 2020 and February 2021 by advertising spending* (May 31, 2022), available at https://www.statista.com/statistics/1112288/us-youtube-advertisers-ranked-by-ad-spend/.

monetized. [14]

76.     The YPP applicant signs a contract with YouTube in which they become a Program Partner ("YouTube Partner") and YouTube agrees to profit share with the YouTube Partner.  For advertising revenue, YouTube pays the YouTube Partner 55% of advertising revenue from their page, and YouTube keeps 45% of the advertising revenue. [15]

77.     Joining the YPP is optional, but if someone becomes a YouTube Partner, Google handles all the advertising placement, revenue collection, and pays the YouTube partner their portion of the profits, pursuant to the contract signed. [16]

78.     As a member of the YPP, Google "matches [their] videos with advertisers, decides what ads will appear, and keeps track of all traffic (views), as well as ad responses. YouTube then pays [that person] accordingly for [their] participation in the Partner program." [17]

79.     YouTube offers their YouTube Partner special tools to improve and further monetize their page.

---

[14] YouTube Help, *YouTube Partner Program overview & eligibility*, (last viewed January 16, 2023), available at https://support.google.com/youtube/answer/72851?hl=en#zippy=%2 Cwhat-happens-if-my-counts-drop-below-the-threshold-after-i-apply%2Cim-no-longer-in-ypp-or-i-was-never-in-the-program-and-im-seeing-ads-on-my-videos-am-i-earning-revenue-from-those-ads.

[15] Id.

[16] Rich, Jason, *How to Become A YouTube Partner*, Entrepreneur (Dec. 19, 2013), available at https://www.entrepreneur.com/science-technology/how-to-become-a-youtube-partner/229919.

[17] Id.

80.     YouTube Partners agree to follow and abide by the YouTube Terms of Service and Community Guidelines.

81.     A YouTube Partner that fails to comply with the YouTube Terms of Service and Community Guidelines can be demonetized or have their video removed, among other penalties.

82.     YouTube also "recommends" content through their algorithm.  Not all videos are recommended; rather, the YouTube algorithm seeks to prioritize videos with high watch time and video performance.[18]

83.     Google is, in part, an advertising broker, selling attention to companies that will pay for it, and the longer people stay on YouTube or access its recommended content, the more money YouTube and its parent companies make.

84.     Google has the ability to, and in fact has, demonetized some of its YouTube Partners in the past for violating the YouTube Terms of Service and Community Guidelines.

85.     Platforms like YouTube have learned that outrageous, tortious, and divisive content drives users and profits.

---

[18] Sweatt, Lydia, *YouTube Algorithm Guide: How Your Videos Are Recommended to Viewers,* VidIQ (Apr. 20, 2021), available at https://vidiq.com/blog/post/how-youtube-algorithm-recommends-videos/?utm_source=google&utm_medium=cpc&utm_ campaign= 17815400597__s-pmax-en-us-top_&utm_content=&utm_term= &a=1103&source= 17815400597__s-pmax-en-us-top_&aff_sub=google&aff_sub2= cpc&aff_sub3=&aff_ sub4=&afmc=1yc&gclid=Cj0KCQiAiJSeBhCCARIsAHnAzT _DD_4_1wK-i8NzIIcn9-1yqusnbQbD2C2x0PHXlnjVE2fJAVUXKuMaAt9nEALw _ wcB.

14

86.     YouTube's recommendation system is responsible for generating the majority of all user viewing time on the platform and much of the most interacted with materials involve controversial, intense, violent, and extreme views.[19]

87.     Defendant YouTube pays its YouTube Partners to create content because it benefits from increased user activity, which in turn increases advertising revenue, and other promotional revenue sources.

88.     A former Google executive was quoted in the Wall Street Journal saying: "There's this idea that the search algorithm is all neutral and goes out and combs the web and comes back and shows what it found, and that's total BS."[20]

89.     More than 70% of the videos watched on YouTube are videos recommended by YouTube's non-neutral algorithm in an effort to drive user engagement and therefore advertising profits.[21]

90.     YouTube allows YouTube Partners to monetize their platforms on its product to generate revenue for itself and its users, including YouTube Partners that violate the Community Guidelines and laws prohibiting the sexual exploitation of

---

[19] Zeynep Tufekci, *YouTube, the Great Radicalizer*, N.Y. Times (Mar. 10, 2018), at 6, available at https://www.nytimes.com/2018/03/10/opinion/sunday/youtube-politics-radical.html.

[20] Grind, Kristen, et al, *How Google Interferes with Its Search Algorithms and Changes Your Results*, Wall Street J. (Nov. 15, 2019), available at https://www.wsj.com/articles/how-google-interferes-with-its-search-algorithms-and-changes-your-results11573823753.

[21] E.g., M. Faddoul et al., *A Longitudinal Analysis of YouTube's Promotion of Conspiracy Videos*, arXiv: 2003.03318 (Mar. 6, 2020), available at https://arxiv.org/abs/2003.03318.

children.

91.     YouTube's product was built to promote hateful, harmful, and controversial content as it is the most engaging to users, including its minor users.[22]

92.     YouTube in turn pays its YouTube Partners a range of $0.50 to $6 USD per 1,000 views on any video, including materials depicting minors in violation of sex trafficking and child pornography laws, as well as other criminal statutes.[23]

93.     YouTube has employed a tiered revenue-sharing governance.  Non-monetized general users of the platform were being given far more freedom than YouTube Partners, who were bound by their YPP Agreement and were required to ensure their content was "advertiser-friendly."[24]  After all, the very purpose of the YPP was to increase profits from YouTube advertising by employing the content producers that were valuable to YouTube and had the potential to increase their revenue.

94.     Some YouTube Partners have used their YouTube platform, in a profit-sharing partnership with YouTube, to facilitate sex trafficking and build a pool of

---

[22] Lewis, Paul, *Fiction is Outperforming Reality: How YouTube's Algorithm Distorts Truth*, The Guardian (Feb. 2, 2018), available at https://www.theguardian.com/ technology/2018/ feb/02/howyoutubes-algorithm-distorts-truth.

[23] *See* YouTube, *How YouTube creators earn money - how YouTube works*, YouTube, (last visited Dec 1, 2022), https://www.youtube.com/howyoutubeworks/product-features/monetization/#:~:text=Monetization%20for%20Creators,Overview&amp;t ext=YouTube%20Creators%20are%20individuals%20who,%2C%20merchandise%2 0sales%2C%20and%20subscriptions.

[24] Caplan, Robyn and Tarleton Gillespie, *Tiered Governance and Demonetization: The Shifting Terms of Labor and Compensation in the Platform Economy*, Sage Publishing (April-June 2020), available at https://journals.sagepub.com/doi/pdf/10.1177/ 2056305120936636.

children from which to select and groom their next victim from within.

95.     YouTube actively monitors where it appears in the news and sends a daily email to its employees detailing this coverage.  This has been referred to by the moniker, "The Nightmare Fuel."

## THE RISE OF ONISION TO BECOME ONE OF YOUTUBE'S MOST INFLUENTIAL PERSONAS ONLINE, ALONG WITH HIS SPOUSE, LAINEY

96.     On January 29, 2006, Onision started a YouTube channel and began posting to it on October 17, 2007.

97.     Onision became known quickly for his content and began creating and posting videos to YouTube. He quickly became known for his commentary, some of which was humorous, and some of which was objectifying, offensive, and controversial.

98.     Onision targeted underage girls and provided content that appealed to that age group, such as comments on body image, appearance, self-identity, suicide ideology, and similar topics. Onision would also rate and comment on pictures of people and their bodies, often sent to him by young teen girls.

99.     Despite push back from the online community about Onision's damaging and negative commentary to young teen girls, he rebuffed it by claiming he was being "honest."

100.    He also posted content that he claimed was comedy, but was actually a smear campaign against his ex-girlfriends and an effort to publicly humiliate them.

101.    On August 5, 2005, Onision married his first wife, Skye Jackson

("Skye").

102.    Upon information and belief, shortly after their marriage, Onision began to isolate Skye and prevent her from associating with friends and family.

103.    Onision produced several online videos with Skye, some on YouTube and some on other websites.

104.    In 2009, Onision was discharged from the Air Force. It was after his discharge that he began seriously pursuing a YouTube career.

105.    In 2009, Onision hit ultimate popularity online with his release of the Banana Song, which went viral with over 90 million views, and was featured on Comedy Central series Tosh.O in 2010.[25] Skye participated in this video.

106.    Onision targeted minor audiences on YouTube and specifically targeted minors with emotional vulnerabilities and pre-existing traumatic experiences such as eating disorders, suicidal ideations, mental health disorders, and more.

107.    At the same time, Onision rose in popularity because he was commenting on and doing skits portraying other YouTuber's, including popular YouTuber, Shane Dawson.

108.    In 2010, Onision and Skye divorced.

109.    As Onision's popularity grew, he gained enough popularity that he was

---

[25] *Onision, Banana Song (I'm a Banana)* (Sept. 25, 2009), https://www.imdb.com/title/tt7030624; Tosh.O, Comedy Central, *This Week's Viewer Video: I'm a Banana* (Feb. 4, 2010), http://tosh.comedycentral.com/blog/2010/02/04/this-weeks-viewer-video-im-a-banana.

able to participate in YouTube's Partnership Agreement, which allows a YouTuber that has gained a certain number of followers to monetize their platform and make money from the content that is posted.

110.   As of the filing of this lawsuit, Onision has been in the Partnership Program for approximately a decade and has monetized his videos during this time period and all relevant time periods.

111.   During his tenure as a member of YouTube's Paid Partnership Program, Onision posted videos and other content specifically targeting teen users and their insecurities—with certain video titles tailored to teenage concerns, including:

"Am I Pretty?;

Am I Ugly or Not?;

Should People Shave Their Legs (and Arms and "Down There");

How to Flirt With Guys;

How to Tell if You're Circumcised;

How to Ask Someone to Date You;

How Skinny is Too Skinny?;

How to Give a Hickey."

112.   The internet community began to take issue with Onision's content as early as 2012.

113.   In January of 2012, Onision published a video about one of his ex-girlfriends in which he stated that because she had slept with more than 20 people

19

before him, she was a "slut" who cannot be raped.[26]

114.    As a result of this video, numerous people asked YouTube revoke his YPP Agreement.

115.    Shortly after this occurred, viewers signed a Change.org Petition to demonetize Onision which was sent to YouTube.

116.    Many viewers reported Onision's accounts to AdSense, which is a Google program that matches ads to the individual YouTube website based on content and visitors and coordinates the advertising makeup that allows for the monetization of a YouTube Partner's website.  Since it is a Google program, a report to AdSense is effectively a report to Google.

117.    One reporter in particular specifically flagged for Google that not only was this video harmful, but stated amongst other comments about Onision:

> ". . . I'm disgusted by his recent videos and, despite his attempt at an apology, I do not believe he is actually sorry, or actually will change his behavior in the future. It seems to me that this is part of a cycle of his, where he makes several videos that deeply offend a percentage of his fans and viewers, he receives a backlash by those affected by his judgmental comments, he rants about them and dismisses them as "haters," and then he finally apologises to save face and tries to cover it up by deleting the videos. Only the damage is already done, it's far too late for an apology. His young, impressionable followers have already swallowed his opinions whole and committed to them as gospel. It is also a very cheap way to rack up views and collect ad revenue.

---

[26] Eordogh, Fruzsina, *YouTuber inflames viewers with rape comments*, The Daily Dot (Jan. 25, 2012), available at https://www.dailydot.com/unclick/onision-rape-vidcon-haters-youtube-banned/.

> Sponsoring these videos is condoning his destructive
> behaviors. I can't imagine that you, or the companies that
> advertise with you, support such opinions. Revoking his
> sponsorship will send the message that you do not take this
> lightly, and that you respect the people who are watching
> the ads that you attach to these videos . . ."[27]

118.   Many viewers flagged the offensive video online through YouTube.

119.   Viewers wrote to VidCon, an upcoming convention at which Onision was scheduled to speak at.

120.   YouTube took no action and did nothing to enforce their Terms of Service and Community Guidelines or force Onision to stop posting content that violated these guidelines.

121.   Instead, YouTube continued to enable and reward Onision for his harmful and volatile content by allowing him to continue in the YouTube Partnership Program and profit-share with YouTube.

122.   On January 20, 2012, VidCon acted differently however, and responded to the communication received by removing Onision as a speaker at VidCon and banning him from attending.  Onision responded on social media acknowledging this:



**Onision**
If you want someone to blame for my absence, you can blame the haters who spammed VidCon with anti-Onision mail + VidCon itself for giving in to the pressure & going back on their word.
Share · 2 minutes ago · 

123.   Despite all of this, Onision's YouTube partnership remained intact, YouTube took no action, and Onision's content escalated.  He continued to use his

---

[27] "Money-Mud," *Stand Against Onision's Hateful Behavior*, Tumblr (Jan. 2012), available at https://money-mud.tumblr.com/post/16044152816/amp.

channel to lure and entice young, vulnerable teenagers and then groomed them with his messaging.

*Onision Formed his partnership with Lainey,[28] who Assisted in His Grooming and Recruitment of Underage Girls.*

124.   When Lainey was an underage girl, she began fangirl messaging Onision for several months.

125.   On February 12, 2012, Lainey, who at the time was a minor child named Taylor, used the online screenname of "Lainey" or "Laineybot."

126.   Lainey and Onision connected online.  Here is one such example of how they connected:



127.   While Lainey was still 17 years old, Lainey and Onision began a romantic relationship.

128.    On November 14, 2012, Lainey and Onision got married.

129.   Onision and Lainey began working together to groom and lure underage girls through Onision's YouTube channel and forums.

---

[28] Pronouns will be used based on the timing of what is discussed. In 2012, Lainey identified as a female and female pronouns will be used when discussing that time frame. In 2019, Lainey changed genders to identify as male, and male pronouns will be used when discussing events after that time period.

130.   Onision's YouTube channels gave him the fame, platform, and megaphone to reach countless people. The content he discussed attracted young teenage girls.

131.   As his wife, Lainey became a part of the Onision story and gained popularity and attraction by many of Onision's followers.

*Onision Forums Promoted and Enabled Predatory Behavior*

132.   Onision created Onision Forums that he promoted in every, or almost every, video posted to his YouTube channels.

133.   In his videos on his monetized platform, Onision invited his extremely young follower-base to message him on his forums.

134.   In some videos, Onision invited the same follower-base to submit photos of their bodies for him to "rate" through the Onision forums.

135.   Onision would then comment on what was said to him and the young teen body videos on his YouTube channel.

136.   Pursuant to the terms of the YPP, YouTube would profit-share with Onision for these videos.

137.   The Onision Forums were overseen by Onision and Lainey.   Any moderators on the forums answered to Onision and/or Lainey who ultimately controlled the tone and what was permissible on the forums.

138.   Minors and impressionable young teens were the primary age group that were drawn to Onision's YouTube channels.

139.   Lainey's presence in Onision's life became a major draw for their young

fan base as well.  In fact, many Onision fans became far more invested when Lainey joined Onision's channel and his life.

140.    Onision and Lainey published many forum topics, inviting their followers, including their child followers to respond, such as:

> "What age does Greg think you are?
>
> Rate me from 1 to 10
>
> Would Laineybot date you?
>
> Hot or not, Laineybot chooses.
>
> Marry, ****, or kill
>
> Are your boobs actually too big/small?
>
> What is Onision's Opinion on you?
>
> Would you date me?
>
> Makeup or no makeup
>
> Hot or not
>
> Show off your Body Abnormalities
>
> What does Lainey think about your body?

141.    Young people, including minors, would join the forums in the hopes that Onision and/or Lainey would communicate with them, which they sometimes did.

142.    Onision often commented on forum posts in his YouTube videos, giving the named fan a moment of stardom.

143.    Moderators were selected to operate as volunteers and oversee the forums.

24

144.    Some of the moderators were children themselves.

145.    These volunteer moderators answered to Onision and/or Lainey and Onision and/or Lainey controlled the content and what or who was ultimately banned or removed.

146.    The volunteer moderators never received training or genuine guidance on how to properly moderate the forums to prevent predators from communicating with the minor children on the forums, what grooming looks like, and other policies to keep the forums safe.

147.    The Onision Forums had no specific rules or terms of conduct and the forum operated like the wild west.  If any rules did exist, they were not enforced.

148.    Onision turned around and commented on what was said in the forums in his YouTube videos.

149.    Onision's acknowledgement of commentary from his fans in his YouTube videos caused his fans to be more eager to send him content and reach out. This further increased his reach within his pool of victims.

*Lainey Groomed, Lured, and Recruited Regina.*

150.    In 2012, a young child named Regina[29] was twelve (12) years old, was depressed, and googled "How to Kill Yourself." Regina found Onision's video that shamed anyone that wanted to kill themselves and found connection.

---

[29] Regina uses non-binary pronouns of "they/their/them." In an effort to be clear that Regina is being referenced as a singular person instead of in the plural context, singular female pronouns will be used in this document. This is intended to achieve precise clarity, to avoid confusion, and is done with Regina's consent.

151.    Regina began to watch many of Onision's videos and felt a deep connection.  She became a huge fan.

152.    Under her username handle,[30] Regina developed online relationships and friendships with other YouTubers as her community of support.

153.    On September 28, 2012, 14-year-old Regina (hahag0away @beaut1ful_paradise_) began speaking with Lainey (coolguykai @laineybot) through Instagram and was starstruck, as depicted below:



154.    Regina turned 15-years-old approximately one month after meeting Lainey.

---

[30] Regina used numerous handles, to include: @beaut1ful_paradise, @hahag0away, @hey_its_regina, and @hahan0bye.

155.    Regina initially told Lainey she was nineteen (19) years old, but quickly clarified that the real age was fifteen (15) years old. Lainey was not deterred from sexually pursuing Regina upon finding out her real age.

156.    Regina and Lainey went from speaking occasionally to speaking daily and Regina soon considered Lainey to be a best friend based on the level of sharing and intimacy between the two.

157.    Lainey continued to flirt, groom, and condition Regina when she was 15-17 years old.

158.    Lainey frequently had highly sexualized conversations with Regina.

159.    When the opportunity arose, Regina became a volunteer forum moderator for the Onision Forums.

160.    At this time, Regina was a young teen herself and was not old enough to fully understand the boundaries of what was appropriate for the forums.

161.    Regina received no training on how to be a moderator.

162.    Regina became a volunteer moderator for Lainey's own forums as well as Onision's and became the moderator for all of Lainey's social media.

163.    Regina admired Lainey and formed an emotional and sexual attraction to her.

164.    While 16-years-old, Regina confided in Lainey that she was bisexual and was questioning her gender.

165.    Lainey encouraged this conversation and stated that she liked girls too, leading Regina to believe that being with Lainey in a romantic way was an option.

166.    In the summer of 2015, Lainey came out officially as "bi-sexual."

167.    Around the same time, Onision made it publicly known on YouTube that he was agreeable to Lainey having a relationship with another girl and the couple began posting YouTube videos advertising the same.

168.    Upon information and belief, Onision encouraged and enticed Lainey to enter into a relationship with another girl.

169.    Onision and Lainey began publicly talking on YouTube about having a polyamorous relationship with other girls.

170.    Although it was presented to the world as an opportunity for Lainey to be with a woman, in reality, this was done so that Onision could engage in threesome sex acts with other girls and used Lainey as the bait to lure them in.

171.    Onision demanded a threesome and stated that he will not allow Lainey to have sex with a girl unless he participates.

172.    Despite being married and an adult, Lainey began dating underage Regina.

173.    Regina had just turned 17-years-old only eight days before the "dating" announcement:



174.    During this "relationship," Lainey groomed underage Regina with flirtatious and suggestive comments, such as "I love you," sexual commentary, and sent nude photos. Some examples of such communications were as follows:









175.    Lainey also sent Regina "thirst traps," which is an internet phrase for lewd photos depicting Lainey in her bra and underwear, or a lowcut shirt, and were supposed to leave the viewer "thirsty for more" due to the sexual inuendo contained

in the photo(s).

176.    Lainey frequently requested that Regina send the same nude and "thirst trap" photos back.

177.    Lainey and Regina frequently had Skype calls. On one such Skype call, Lainey appeared on camera topless.  This was done as a grooming tactic to desensitize Regina to sexuality and test her boundaries.

178.    In addition to the "thirst trap" images sent by Lainey to Regina, Lainey also requested photographs of Regina.

179.    In response to Lainey's demands, Regina sent an image of her exposed breasts to Lainey.

180.    Separately, in response to Lainey's demands, Regina sent an image of her exposed buttocks to Lainey.

181.    Lainey discussed sexuality with her, to include sexual acts she wished to do with Regina, and expressed sexual and emotional desire for her.

182.    In 2015, Lainey encouraged 17-year-old Regina to visit her and Onision together.

183.    Lainey offered to pay all of Regina's travel expenses for the trip.

184.    Lainey intended to lure, entice, recruit, and solicit Regina to their home so that she could join in sexual activity with Regina and in threesome sexual acts with Onision and Lainey together.

185.    Further, upon information and belief, Lainey intended to lure Regina to their home so that Regina could be given to Onision so that he could engage in sexual

acts with Regina.

186.    Regina, being young and naïve, desperately wanted to visit Lainey, but Regina's mother would not let her travel.

*Onision and Lainey Groomed, Lured, and Recruited Sarah At Same Time*

187.    Meanwhile, a minor child named Sarah found Onision's channel on YouTube.  Sarah became a fan of the Onision Speaks channel, and in 2012, became even more of a fan when Lainey was introduced as Onision's significant other.

188.    At age 13, Sarah reached out to Onision and Lainey on their Twitter page via her own handle. Sarah began responding to the posted Tweets, to which Lainey would usually respond.

189.    Around the same time, Sarah joined a Kik chat group for Lainey fans and became friends with the underage moderator, Regina, through this group.

190.    Regina had been appointed the moderator of Lainey's forum and Lainey had become very close with Regina at this point.

191.    In the grooming process, it is common for predators to use one victim to access other victims and to invoke loyalty and trust in their victims by making loyalty and trust extremely desirable traits that the perpetrator rarely gives out.[31]

192.    Lainey asked Regina about her friend, Sarah, and wanted to know if Sarah was "trustworthy."

---

[31] Rymanowicz, Kylie, *How Child Sexual Predators Groom Children*, Michigan State University Extension (last visited January 16, 2023), available at https://www.canr.msu.edu/creating-safe-environments/uploads/files/Final%20-%20Grooming%20Children.pdf.

193.    Regina "vouched" for Sarah, causing Regina to feel "trusted" and valued by Lainey.

194.    Prior to this, Sarah and Lainey had recently started messaging on Kik and Lainey had told Sarah she found her "cute."

195.    At this same time, Lainey was 19 years old, about to turn 20 years old.

196.    When Lainey first began speaking to both Regina and Sarah, Lainey identified as a straight, married woman.

197.    As a result, neither Regina, nor Sarah understood that she was being groomed by Lainey, as each believed sexual contact could never result from these conversations.

198.    Throughout 2015, Sarah, Regina, and 20-year-old Lainey formed a strong friendship and began a group chat called "The Three Musketeers."

199.    When grooming minors, many predators will talk about sex with their target to desensitize the child so that sexual commentary feels normal and common place. Such desensitization allows the predator to more easily move to the next step in the grooming process. [32]

200.    Lainey quickly turned this group chat into a flirtatious, sexual chat, and continued sending sexual commentary and photos to Regina and Sarah.

201.    Lainey added a bear and a heart emoji next to Sarah's name in her own

---

[32] *Grooming: Know the Warning Signs,* RAINN (July 10, 2020), available at https://www.rainn.org/news/grooming-know-warning-signs.

phone, as well as red lipstick next to Regina's name in her phone, showing how she viewed these two minor children:



202.  Furthermore, Lainey selected and set the pictures associated with each child's name. Sarah's picture was an inside joke that referenced sexual acts, and Regina's picture was a sexually suggestive photo of Regina.

203.  Lainey shared explicit details of her sex life with Onision with both Regina and Sarah.

204.  Because of the heavy sexual content in the conversations, the flirtations, the attention, and Regina's own vulnerabilities, 16-year-old Regina was having intense romantic feelings for Lainey.

205.  Over the spring of 2015, Lainey tweeted Sarah and Regina many sexual and flirtatious comments, to include:



206.   In the summer of 2015, Lainey came out officially as "bi-sexual."

207.   Onision informed Lainey that she could have a "girlfriend." The couple posted videos advertising the same.

208.   When Lainey realized Regina could not visit them for the purpose of engaging in sexual activity, Regina was "replaced" with Sarah as their target.

209.   Sarah was then invited to visit the couple and ultimately raped by Onision.

*YouTube Response*

210.   After Sarah moved in, word got out that a minor child had moved in with Onision and Lainey and many people on YouTube were not comfortable with this.

211.   Many YouTuber's that were also part of the YPP began to speak about Onision on their own YouTube channels and media began to surface that Onision and his spouse Kai (formerly Lainey) were predators.

212.   This culminated in a documentary that was released on Discovery Plus that featured Regina, Sarah, and another ex-girlfriend of Onision named Shiloh.

213.   It was only after the publication of this documentary that YouTube finally decided to demonetize Onision for violations of their policies on or about

34

January 21, 2021.

214.    YouTube stated to news outlet Tubefilter that "it took action because Onision violated the Partner Program's Creator Responsibility guidelines. These mandate that partners not engage in behavior (either on- or off-platform) that can cause widespread harm to the YouTube community, and potentially damage the trust among creators, users, and advertisers."[33]

215.    Notably, although YouTube took away Onision's ability to make money, but did not remove him from the platform.

216.    YouTube is still profiting from Onision's content; it is simply not profit-sharing with him anymore.

## CAUSES OF ACTION

### COUNT 1

### VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
### 18 U.S.C. §§ 1591(A)(1) AND 1595
### (*Defendants Onision and Lainey*)

217.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

218.    Defendants Onision and Lainey knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C.

---

[33] Hale, James, *YouTube Removes Onision From Partner Program, Demonetizes His Channels over Child Safety Concerns*, Tubefilter (Jan. 20, 2021), available at https://www.tubefilter.com/2021/01/20/youtube-onision-partner-program-demonetized/.

§§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

219.   Defendants Onision and Lainey's conduct was in or affected interstate and/or foreign commerce.

220.   Plaintiff was a minor during all relevant time periods pertinent to this lawsuit.

221.   Both Onision and Lainey knew, or were in reckless disregard of the fact, that Plaintiff had not attained the age of 18.

222.   Lainey groomed Plaintiff to engage in a relationship with her, exchange nude photographs with her, caused minor Plaintiff to have strong romantic feelings for her.

223.   Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice Plaintiff to travel to their house for the purpose of engaging in sex acts with her.

224.   Plaintiff was offered something of value for engaging in sex acts; to-wit: Onision and Lainey were going to pay for the cost of transportation to their residence, they allowed Plaintiff to serve as a volunteer moderator on their channels which made Plaintiff feel special, and Lainey, acting in concert with Onision, showered Plaintiff with love and affection which was extremely valuable to Plaintiff.

225.   Lainey and Onision received something of value as part of the grooming and enticement for sex trafficking; to-wit: Lainey was sent CSAM images of Plaintiff upon request and Plaintiff became a volunteer moderator for the Onision and Lainey

36

forums.

226.    Defendants Lainey and Onision's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT II

## BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(a)(2) AND 1595
### (*All Defendants*)

227.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

228.    Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

229.    Defendants' conduct was in or affected interstate and/or foreign commerce.

230.    Plaintiff was a minor during all relevant time periods pertinent to this lawsuit.

231.    Defendants knew, or were in reckless disregard of the fact, that Plaintiff had not attained the age of 18.

232.    Lainey groomed Plaintiff to engage in a relationship with her, exchange nude photographs with her, caused minor Plaintiff to have strong romantic feelings for her.

37

233.    Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice Plaintiff to travel to their house for the purpose of engaging in sex acts with her.

234.    YouTube was notified multiple times that Onision was harming young people with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

235.    Defendant YouTube knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

236.    Defendant YouTube knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

237.    Plaintiff was offered something of value for engaging in sex acts; to-wit: Onision and Lainey were going to pay for the cost of transportation to their residence, they allowed Plaintiff to serve as a volunteer moderator on their channels which made Plaintiff feel special, and Lainey, acting in concert with Onision, showered Plaintiff with love and affection which was extremely valuable to Plaintiff.

238.    Lainey and Onision received something of value as part of the grooming and enticement for sex trafficking; to-wit: Lainey was sent CSAM images of Plaintiff upon request and Plaintiff became a volunteer moderator for the Onision and Lainey forums.

239.    Defendants conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

38

## COUNT III

## CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO POSSESSION AND DISTRIBUTION OF CHILD PORNOGRAPHY
## 18 U.S.C. §§ 2255 AND 2252A
## (*Defendant Lainey*)

240.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

241.    Defendant Lainey knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 2252A, occurring within the territorial jurisdiction of the United States.

242.    Defendant Lainey's conduct was in or affected interstate and/or foreign commerce.

243.    Plaintiff was a minor during all relevant time periods pertinent to this lawsuit.

244.    At all relevant times to this lawsuit, Defendant Lucas Jackson (Lainey) was an adult.

245.    Plaintiff was a victim of possession of child pornography laws, as set forth in 18 U.S.C. § 2252A(a)(5)(B) which provides that any person commits a federal crime who:

> "knowingly possesses, or knowingly accesses with intent to view, any [...] material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce [...] or that was produced using materials [...] affecting interstate or foreign commerce by any means, including by computer."

39

246.    Defendant Lainey knowingly requested, received, accessed, viewed and/or possessed lewd and pornographic images of Plaintiff, knowing she was a minor.

247.    As a proximate result of Defendants' violations of 18 U.S.C. § 2252A, Plaintiff suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

248.    18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 2252A, and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

249.    Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

250.    Plaintiff has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

251.    Plaintiff intends to prove her actual damages as a result of Defendant Lainey's actions.

252.    At minimum, Plaintiff intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-

judgment interest, and such other relief as the Court deems appropriate.

253.    18 U.S.C. § 2255 contains non–limiting language which allows Plaintiff to remedy violations of 18 U.S.C. §§ 2252A and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

## COUNT IV

### CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO SEX TRAFFICKING
### 18 U.S.C. §§ 2255 AND 1591(a)
### (*All Defendant*)

254.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

255.    Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 1591(a), occurring within the territorial jurisdiction of the United States.

256.    Defendants' conduct was in or affected interstate and/or foreign commerce.

257.    Plaintiff was a minor during all relevant time periods pertinent to this lawsuit.

258.    Defendants knew, or were in reckless disregard of the fact, that Plaintiff had not attained the age of 18.

259.    At all relevant times to this lawsuit, Defendants Lainey and Onision were adults.

260.    Plaintiff was a victim of sex trafficking, as set forth in 18 U.S.C. § 1591(a)

41

which provides that any person commits a federal crime who:

> "knowingly (1) […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in [the same],
>
> knowing, or, […] in reckless disregard of the fact, that means of force, threats of force, fraud, coercion […] will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act […]"

261.   Lainey groomed Plaintiff to engage in a relationship with her, exchange nude photographs with her, caused minor Plaintiff to have strong romantic feelings for her.

262.   Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice Plaintiff to travel to their house for the purpose of engaging in sex acts with her.

263.   YouTube was notified multiple times that Onision was harming young people with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

264.   Defendant YouTube knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

265.   Defendant YouTube knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

266.   Plaintiff was offered something of value for engaging in sex acts; to-wit:

Onision and Lainey were going to pay for the cost of transportation to their residence, they allowed Plaintiff to serve as a volunteer moderator on their channels which made Plaintiff feel special, and Lainey, acting in concert with Onision, showered Plaintiff with love and affection which was extremely valuable to Plaintiff.

267.   Lainey and Onision received something of value as part of the grooming and enticement for sex trafficking; to-wit: Lainey was sent CSAM images of Plaintiff upon request and Plaintiff became a volunteer moderator for the Onision and Lainey forums.

268.   As a proximate result of Defendants' violations of 18 U.S.C. § 1591(a), Plaintiff suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

269.   18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 1591, and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

270.   Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

271.   Plaintiff has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

272.   Plaintiff intends to prove her actual damages as a result of each of the

43

Defendants actions.

273.   At minimum, Plaintiff intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

274.   18 U.S.C. § 2255 contains non–limiting language which allows Plaintiff to remedy violations of 18 U.S.C. §§ 1591(a) and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

## COUNT V

## CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO COERCION AND ENTICEMENT
## 18 U.S.C. §§ 2255 AND 2422
### (*All Defendant*)

275.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

276.   Defendants each knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 2422, occurring within the territorial jurisdiction of the United States.

277.   Defendants' conduct was in or affected interstate and/or foreign commerce.

278.   Plaintiff was a minor during all relevant time periods pertinent to this lawsuit.

279.   Defendants knew, or were in reckless disregard of the fact, that Plaintiff

44

had not attained the age of 18.

280.    At all relevant times to this lawsuit, Defendants Lainey and Onision were adults.

281.    Plaintiff was a victim of sex trafficking, as set forth in 18 U.S.C. § 2422 which provides that any person commits a federal crime who:

> "knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, […] to engage in […] any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, [… or]
>
> using […] means of interstate or foreign commerce, […] knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in […] any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, […]"

282.    Lainey groomed, persuaded, induced, enticed, and/or coerced Plaintiff to engage in a relationship with her, exchange nude photographs with her, caused minor Plaintiff to have strong romantic feelings for her.

283.    Lainey, in coordination with Onision, then used that grooming to lure, persuade, induce, entice, and/or coerce Plaintiff to travel to their house in Washington State for the purpose of engaging in sex acts with her while she was a minor.

284.    YouTube was notified and had full knowledge that Onision was using their platform to groom, lure, persuade, induce, entice, or coerce children with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

45

285.    As a proximate result of Defendants' violations of 18 U.S.C. § 2422, Plaintiff suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

286.    18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 2422, and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

287.    Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

288.    Plaintiff has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

289.    Plaintiff intends to prove her actual damages as a result of each of the Defendants actions.

290.    At minimum, Plaintiff intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

291.    18 U.S.C. § 2255 contains non–limiting language which allows Plaintiff to remedy violations of 18 U.S.C. §§ 2422 and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs demand judgment against all the Defendants on each of the above-referenced claims and Counts and as follows:

a. That the Court award Plaintiff compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

b. That the Court award punitive or exemplary damages in an amount to be determined at trial;

c. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

d. That the Court award pre- and post-judgment interest at the maximum legal rate;

e. That the Court award actual damages pursuant to 18 U.S.C. § 2255(a);

f. That the Court award of liquidated damages in the amount of $150,000 from each of Defendants violations pursuant to 18 U.S.C. § 2255(a);

g. That the Court grant all such other relief as it deems just and proper; and

h. That the Court retain jurisdiction of this matter to ensure all forms of relief it deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

DATED: February 8, 2023                    _/s/ Lisa D. Haba_____
                                           Lisa D. Haba (FBN 077535)
                                           **THE HABA LAW FIRM, P.A.**
                                           1220 Commerce Park Dr., Suite 207

Longwood, FL 32779
Telephone: (844) 422-2529
lisahaba@habalaw.com

*/s/ Jennifer Freeman*
Jennifer Freeman (FBN 1014236)
Margaret E. Mabie (*Pro Hac Vice\**)
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: (929) 232-3128
jenniferfreeman@marsh.law
margaretmabie@marsh.law

*Attorneys for Plaintiff*
*\*Pro Hac Vice Pending*

48

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

REGINA ALONSO

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff   Marion
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lisa D. Haba
FBN 077535
THE HABA LAW FIRM, P.A.
1220 Commerce Park Dr., Suite 207
Longwood, FL 32779
Telephone: (844) 422-2529

Margaret E. Mabie
MARSH LAW FIRM PLLC
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: (212) 372-3030
margaretmabie@marsh.law

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☒ 360 Other Personal Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 2255
Brief description of cause:
Personal injury

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida  ▾

| | |
|---|---|
| Regina Alonso | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| | ) |
| Google LLC, YouTube LLC, James Jackson, also known online as "Onision," and Lucas Jackson, formerly known online as "Laineybot," "Lainey" and "Kai" | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Google LLC and YouTube LLC
C/O Corporation Service Company
1201 Hays Street
Tallahassee, FL 32301-2525

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Lisa D. Haba
The Haba Law Firm, P.A.
1220 Commerce Park Drive
Suite 207
Longwood, FL 32779

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Google LLC and YouTube LLC

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                    *Server's signature*

                                         _____
                                                    *Printed name and title*


                                         _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida ▾

| | |
|---|---|
| Regina Alonso <br><br> *Plaintiff(s)* <br><br> v. <br><br> Google LLC, YouTube LLC, James Jackson, also known online as "Onision," and Lucas Jackson, formerly known online as "Laineybot," "Lainey" and "Kai" <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   James Jackson
8702 123rd Street East
Puyallup, Washington 98373

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

        Lisa D. Haba
        The Haba Law Firm, P.A.
        1220 Commerce Park Drive
        Suite 207
        Longwood, FL 32779

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____       _____
                                               *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* James Jackson

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida ▾

| | |
|---|---|
| Regina Alonso | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) |
| Google LLC, YouTube LLC, James Jackson, also | ) |
| known online as "Onision," and Lucas Jackson, | ) |
| formerly known online as "Laineybot," "Lainey" and | ) |
| "Kai" | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Lucas Jackson
8702 123rd Street East
Puyallup, Washington 98373

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Lisa D. Haba
The Haba Law Firm, P.A.
1220 Commerce Park Drive
Suite 207
Longwood, FL 32779

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Lucas Jackson _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: